Carl M. Varady, Esq. (Hawai'i Bar No. 4873-0)
**LAW OFFICE OF CARL M. VARADY**
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawai'i 96813
Telephone: (808) 523-8447
Facsimile: (808) 523-8448
Email: carl@varadylaw.com

Felicia Medina, Esq. (Cal. Bar No. 255804)
**SANFORD HEISLER, LLP**
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 795-2020
Fax: (415) 795-2021
Email: fmedina@sanfordheisler.com
Application for *Pro Hac Vice* Granted

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| **LIANE WILSON,** and **JOANNA WHEELER** | ) ) ) | Civ. No. CV-11-00538 LEK BMK |
| PLAINTIFFS, | ) ) ) | |
| v. | ) ) | |
| **WYNDHAM WORLDWIDE CORPORATION, WYNDHAM VACATION OWNERSHIP, INC., WYNDHAM VACATION RESORTS, INC., MICHAEL JONAH, MARK POLLARD, AND TOM VIRAG** | ) ) ) ) ) ) | **FIRST AMENDED COMPLAINT** **JURY TRIAL DEMANDED** |
| DEFENDANTS. | ) ) ) | |

## COMPLAINT

Plaintiffs LIANE WILSON and JOANNA WHEELER allege:

### NATURE OF THE ACTION

1.      This action arises under HRS **§§** 378-1 *et seq.*, H.R.S. § 378-61, *et seq.,* and Hawai'i common law and seeks to correct prohibited discrimination on the basis of gender by WYNDHAM WORLDWIDE CORPORATION, WYNDHAM VACATION OWNERSHIP, WYNDHAM VACATION RESORTS, INC. ("Corporate Defendants"), Vice President of Sales Mark Pollard, Vice President of Sales Michael Jonah, and Director of Sales Tom Virag ("Individual Defendants") (collectively "Wyndham").

2.      Over the course of Plaintiffs' employment at Wyndham, Wyndham permitted management to grant favorable sales opportunities to male Sales Associates and female Sales Associates who responded to male managers' sexual requests.  Because Sales Associates' compensation is based solely on sales commission, male-dominated management's manipulation of sales opportunities resulted in discriminatory compensation against the Plaintiffs.  Moreover, Sales Associates' promotional opportunities are heavily dependent on management's discretion, resulting in discriminatory denials of promotion and career-enhancing opportunities against the Plaintiffs.

### JURISDICTION AND VENUE

3.      Jurisdiction in this case is proper pursuant to Haw. Rev. Stat. § 603-21.5(3).

4.      Venue in this Court is proper because the injuries sustained by Ms. Wilson and Ms. Wheeler, as well as the acts and omissions of Defendants, occurred in Princeville, Hawai'i, and because Defendants have offices in and regularly transact business in Princeville, Hawai'i.

## CONDITIONS PRECEDENT TO SUIT UNDER
## HAW. REV. STAT. §§ 368-11, 368-12

5.　　Ms. Wilson has fulfilled all conditions precedent to the institution of this action under the laws of the State of Hawai'i.  Ms. Wilson has filed an appropriate charge of sexual harassment, gender discrimination, and retaliation with the Hawai'i Civil Rights Commission ("HCRC"); Plaintiff received a "Right to Sue" letter on March 8, 2011.

6.　　Ms. Wheeler has filed an appropriate charge of gender discrimination and retaliation with the Hawai'i Equal Employment Opportunity Commission ("EEOC") on May 27, 2011, and is in the process of perfecting her rights.

## PARTIES

### A.　　Plaintiffs

8.　　**Plaintiff Liane Wilson** (hereafter "Ms. Wilson") was employed by Wyndham as a Sales Associate at Wyndham's Bali Hai Villas location ("Princeville site") in Princeville, Kauai.  She currently resides in Princeville, HI.

9.　　**Plaintiff Joanna Wheeler** (hereafter "Ms. Wheeler") was employed by Wyndham as a Sales Associate at Wyndham's Bali Hai Villas location in Princeville, Kauai. She currently resides in Kapaa, HI.

### B.　　Corporate Defendants

10.　　**Defendant Wyndham Worldwide Corporation** ("Wyndham Worldwide") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  It is registered with the Hawai'i Secretary of State as a foreign profit corporation.   Defendant Wyndham Worldwide has a significant presence in most major hospitality markets globally and throughout the United States.  Defendant Wyndham Worldwide regularly transacts business in and operates numerous hospitality facilities in the State of Hawai'i.

11.     At all times relevant to this Complaint, Defendant Wyndham Worldwide has been an "employer" as defined under Haw. Rev. Stat. § 378-1.

12.     Defendant Wyndham Worldwide offers lodging, vacation exchange/rental, and vacation ownership segments of the hospitality industry and touts more than 20 brands, including Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Wyndham Rewards®, RCI, Landal GreenParks, English Country Cottages, Novasol, Wyndham Vacation Resorts (formerly Fairfield Resorts), and WorldMark by Wyndham (formerly TrendWest Resorts).   Upon information and belief, Defendant Wyndham Worldwide is the parent company of the other named business entity Defendants.   Because of the complicated and often hidden interrelationships between and among the named Defendant business entities and fictitious Defendant entities, the exact connection between and among the Wyndham entities is not completely known at this time.   On information and belief, Defendant Wyndham Worldwide maintains control over central business functions in conjunction with other related Wyndham Corporate entities.

13.     **Defendant Wyndham Vacation Ownership, Inc.** ("Wyndham Vacation Ownership") is a Delaware corporation registered with the Hawai'i Secretary of State as a foreign profit corporation.   Defendant Wyndham Vacation Ownership regularly transacts business in and has multiple facilities in the State of Hawai'i.

14.     At all times relevant to this Complaint, Defendant Wyndham Vacation Ownership has been an "employer" as defined under Haw. Rev. Stat. § 378-1.

15.     Defendant Wyndham Vacation Ownership engages in the marketing and sales of vacation ownership interests, consumer financing in conjunction with the purchase of vacation ownership interests, property management services to property owners' associations, and development and acquisition of vacation ownership resorts.   Defendant Wyndham Vacation

4

Ownership touts itself to be the largest vacation ownership business in the world. Defendant Wyndham Vacation Ownership is headquartered in Orlando, Florida, and maintains a network of 140 properties, 20,000 individual units, and over 800,000 property owners across North America, the Caribbean, and the South Pacific. Because of the complicated and often hidden interrelationships between and among the named Defendant business entities and fictitious Defendant entities, the exact connection between and among the Wyndham entities is not completely known at this time. Defendant Wyndham Vacation Ownership has been named a Defendant in this lawsuit because, upon information and belief, it employed Ms. Wilson and Ms. Wheeler at some point in time relevant to this suit.

16.     **Defendant Wyndham Vacation Resorts, Inc.** ("Wyndham Vacation Resorts") is a Delaware corporation registered with the Hawai'i Secretary of State as a foreign profit corporation. Defendant Wyndham Vacation Resorts is registered as doing business in "timesharing" as "Wyndham Vacation Resorts, Inc." Defendant Wyndham Vacation Resorts, Inc. regularly transacts business in and has multiple facilities in the state of Hawai'i.

17.     At all times relevant to this Complaint, Defendant Wyndham Vacation Resorts has been an employer as defined under Haw. Rev. Stat. § 378-1.

18.     Defendant Wyndham Vacation Resorts is believed to be part of Defendant Wyndham Vacation Ownership and, upon information and belief, sells and finances vacation ownership interests and develops vacation ownership resorts. Because of the complicated and often hidden interrelationships between and among the named Defendant business entities and fictitious Defendant entities, the exact connection between and among the Wyndham entities is not completely known at this time. Upon information and belief, Defendant Wyndham Vacation

Resort maintains control over central business functions in conjunction with other related Wyndham Corporate entities.

**C.      Individual Defendant Michael Jonah**

19.      **Defendant Michael Jonah** ("Defendant VP Jonah"), at all times relevant to the allegations herein, was a resident of Hawai'i.

20.      Upon information and belief, Defendant Jonah has been employed by one or more Corporate Defendants as Vice President of Sales.  Upon information and belief, he is still employed at Wyndham in this location and same role.  At all times relevant to this Complaint, Defendant Jonah was a supervisor  and "agent" of Wyndham.

**D.      Individual Defendant Mark Pollard**

21.      **Defendant Mark Pollard** ("Defendant VP Pollard"), at all times relevant to the allegations herein, was a resident of Hawai'i.

22.      Defendant Pollard was employed by one or more Corporate Defendants as Area Vice President and Vice President of Sales of the Princeville site.  At the end of 2010, he was relocated to Wyndham's Waikiki site and assumed the position of Vice President of Sales of the Waikiki site.  He is still employed at Wyndham.  At all times relevant to this Complaint, Defendant Pollard was a supervisor and "agent" of Wyndham.

**E.      Individual Defendant Thomas Virag**

23.      **Defendant Thomas Virag** ("Defendant Director of Sales Virag"), at all times relevant to the allegations herein, was a resident of Hawai'i.

24.      Defendant Virag has been employed by one or more Corporate Defendants as Director of Sales of the Princeville site.  He is still employed at Wyndham in the same location

and same role.  At all times relevant to this Complaint, Defendant Virag was a supervisor and "agent" of Wyndham.

**PLAINTIFFS' ALLEGATIONS**

**A.**      **Liane Wilson**

25.      Ms. Wilson brings individual claims to recover damages for sexual harassment/hostile work environment, gender discrimination, and retaliation.

26.      Ms. Wilson began her employment with Wyndham in December 2006 as a Sales Associate at Wyndham's Princeville, Hawai'i site.  At the time she applied and was offered employment at Wyndham, Ms. Wilson was not living on the island of Kauai.  As a result, she relocated her home and family to Kauai so that she could pursue a career at Wyndham.

27.      Throughout her career with Wyndham, Ms. Wilson was a high performer and won all of Wyndham's awards for top performers, including the Legend Award, Top Performer of the Year, Rookie of the Year, and President's Club.  Her closing percentage surpassed 68 percent and she generated an average of $3 million in sales each year for ~~the~~ Wyndham.

**i.**      **Sexual Harassment/Hostile Work Environment**

28.      Within weeks after joining the Company in December 2006, VP Pollard approached Ms. Wilson and began to sexually harass her.  VP Pollard's harassment included comments about Ms. Wilson's breasts and suggestions that she wear shorter skirts or low-cut blouses.  On one occasion, VP Pollard told Ms. Wilson that his wife knew that he slept around with other women and that she didn't care.  He said specifically that his wife would not care if he and Ms. Wilson slept together.  Suggestive comments such as these occurred frequently.

29.      VP Pollard also frequently invited Ms. Wilson to have drinks with him.  During award ceremonies, VP Pollard would ask Ms. Wilson to stay with him after everyone else left.

Situations like these became so frequent that Ms. Wilson eventually asked her husband to accompany her to Company events.   This harassment continued up until the date of her termination.

30.    In addition to the sexual harassment committed by Wyndham management, the Company also tolerated coworker harassment.   Ms. Wilson experienced sexual harassment perpetrated by a male colleague, Sales Associate Charles Simerka, who transferred from Tennessee and was living at a timeshare provided to him by Wyndham as a gratuity.   Mr. Simerka routinely made inappropriate remarks about Ms. Wilson's clothes and body.   During meetings with clients, he would gesture to her body and say, "This is why she sells so much." Like VP Pollard, Mr. Simerka often told dirty jokes at the office.   On several occasions, Ms. Wilson complained to Defendant Vice President of Sales Jonah about Mr. Simerka's behavior. VP Jonah always dismissed Ms. Wilson's concerns with comments such as, "That's just because he's a Southerner," or "Boys will be boys."  In August 2009, Ms. Wilson brought her concerns to Human Resources Director Andrea Ward ("HR Director Ward").   HR Director Ward told Ms. Wilson that the Company would "take care of it."  However, upon information and belief, no investigation was conducted.   Mr. Simerka's behavior continued up until the date of her termination.

31.    Ms. Wilson was humiliated by the frequent sexual harassment to which she and her female colleagues were subjected at Wyndham.

### i.   Discriminatory Compensation and Denial of Career-Enhancing Opportunities

32.    Ms. Wilson quickly learned that Wyndham cultivated an environment in which male managers enjoyed unbridled decision-making power and used this power to bestow

promotions and the most favorable sales opportunities upon male employees and female employees who consented to their sexual requests.  Because Ms. Wilson was a female employee who refused Defendant Pollard's sexual advances, she was denied opportunities that affected her pay and chances for promotion.

33.     On one occasion, Defendant VP Jonah promoted female Sales Associate Tashina Lane to a management position after Ms. Lane began having sexual relations with him.  VP Jonah then transferred male Sales Associate Rock White to Ms. Lane's group and manipulated the "Daily Manifest"—the record of timeshare tours to be given by Sales Associates within a given day.  As a result, Mr. White was assigned only tours for existing Wyndham owners who were seeking upgrades and whose credit and debt levels had already been approved by the Company.  Thereafter, Mr. White began generating a substantially larger amount of business than the other Sales Associates, earning between $50,000 and $60,000 per month in commissions.  Because Ms. Lane was Mr. White's direct manager, Ms. Lane received a percentage of these commissions and, as a result, earned more compensation than others at the Princeville site.

34.     Similarly, Wyndham's male managers discriminated against female employees who refused their sexual advances by, *inter alia*, manipulating the Daily Manifest so that these women were given no tours or the most unfavorable tours; placing these women on specific performance ("SP") plans when they failed to meet their sales goals; and ultimately terminating female employees who refused their sexual advances entirely.

35.     For instance, in the summer of 2008, Defendant VP Pollard approached Sales Associate Lisa Sharegt and requested that she have sexual relations with him.  When Ms. Sharegt refused VP Pollard's advances, Defendant Pollard manipulated the Daily Manifest so that Ms.

Sharegt was not given any timeshare tours for existing Wyndham owners who were seeking upgrades.  Instead, Defendant Pollard gave Ms. Sharegt only tours for clients who were uncertain about purchasing from Wyndham or whose debt levels made them questionable candidates for ownership.  As a result, Ms. Sharegt's sales numbers dropped so that her Volume Per Guest ("VPG") dropped to just above the 2,000 benchmark under which an employee is eligible to be fired.  The VPG represents how much a Sales Associate earns per each potential client to whom she gives a tour, and is used by Wyndham to measure Sales Associates' performance.  VP Pollard then terminated Ms. Sharegt, despite the fact that her VPG was above the 2,000 benchmark and that she had never been placed on an SP plan.

36.     By contrast, in September 2009, VP Pollard promoted Joyce Keyhoe, a female Sales Associate who was openly engaged in a sexual relationship with him, to a manager position.  Ms. Keyhoe's VPG was 1,800, or 200 points below the benchmark for firing.

37.     On another occasion, VP Pollard failed to discipline a male Sales Associate whose VPG was below the firing mark.

38.     Upon information and belief, despite egregious instances of gender discrimination and sexual harassment, and despite frequent complaints regarding these incidents to Wyntegrity and Wyndham Human Resources ("HR"), Wyndham failed to discipline the male harassers or remedy the situation.  In addition, some Wyndham employees who complained about the gender discrimination and sexual harassment were fired for making these complaints.  In fact, in 2008, Defendant Pollard announced that anyone who made complaints to HR would be fired.

39.     True to VP Pollard's word, Ms. Wilson observed that three Sales Representatives who complained directly to HR Director Ward were fired within 45 days of making their complaints.  Specifically, in approximately the fall of 2008, VP Pollard physically and verbally

assaulted Regina Hodges ("Ms. Hodges"), a female Sales Associate, in a car.  Ms. Hodges and two witnesses, male Sales Associate Joseph Gephardt ("Mr. Gephardt") and female Sales Associate Jessica Mugrage ("Ms. Mugrage"), who reported the attack to HR Director Ward, were subsequently fired.  Ms. Wilson also complained about the attack to HR Director Ward and gave her the names of additional individuals to interview regarding the incident.  Although Ms. Wilson followed up with HR Director Ward on multiple occasions regarding the investigation of Defendant Pollard's attack, HR Director Ward never responded to her inquiries and never conducted any additional interviews.

40.     In addition to HR Director Ward, other Wyndham Corporate representatives were aware of the rampant sexual harassment and gender discrimination at Wyndham but failed to take any action in response.  For instance, in approximately September 2009, Administrative Director Cindy Lund conducted a sexual harassment training at the Princeville site.  As part of this training, Ms. Lund displayed computer modules with actors acting out different examples of sexual harassment.  In the middle of this presentation to male and female Sales Associates, Defendant VP Jonah interrupted Ms. Lund and stated that our group did not need "this nonsense."  Defendant VP Jonah stated that everyone already knew what they needed to know. VP Jonah then pointed to Sales Associate Holly Fitzpatrick's chest and advised that if a man wanted to say, "Check out the headlights on Holly," he should first ensure that there were no women around.  VP Jonah instructed Ms. Lund to pack up her computer and leave.  Although this sexual harassment training was required by the Company, Wyndham never reprimanded VP Jonah for his statements and actions, and the Princeville site never received any additional sexual harassment training.

### i.        Discriminatory Actions Related to Pregnancy and Maternity Leave

41.    Over the course of Ms. Wilson's employment, she also observed Wyndham discriminate against female employees because they were pregnant or were working mothers. Female Sales Associates who took leave for pregnancy or childcare responsibilities faced increased scrutiny at the hands of Wyndham management.

42.    For example, Defendant VP Jonah often threatened to place Ms. Mugrage on probation due to attendance issues when she asked to take time off to care for her son when he was ill.  VP Jonah's treatment of Ms. Mugrage was in sharp contrast to his treatment of male Sales Associate Makana Osbourne.  Mr. Osbourne often missed days of work.  On the days he did appear at the office, he would sometimes smell of alcohol and appear under the influence of illegal substances.  However, despite Mr. Osbourne's attendance problems and appearance, he was never disciplined.

43.    Ms. Mugrage complained to Defendant VP Pollard about the disparate treatment she was experiencing, pointing out that Mr. Osbourne was not being evaluated at the same standards.  However, Defendant Pollard dismissed her concerns.

### i.        <u>Retaliation</u>

44.    In March 2007, Ms. Wilson confronted Defendant VP Pollard about his sexual harassment.  She told him that his behavior was inappropriate and that it was making her work environment uncomfortable, and asked him to stop.  After a brief respite, Defendant Pollard resumed his harassment of Ms. Wilson.

45.    Ms. Wilson then turned to the Company for help.  She contacted HR Director Ward.  When she told HR Director Ward about Defendant VP Pollard's sexual harassment of her, HR Director Ward responded, "Maybe you should just wear turtlenecks."

46.     Ms. Wilson also sought help from Clarice Inouye, Wyndham's Human Resources Manager ("Ms. Inouye") located in Kauai.  However, Ms. Inouye's response was equally non-responsive.

47.     Ms. Wilson soon realized that the Company would not respond to complaints about sexual harassment.  The Company's refusal to take action to protect its female employees communicated to male employees that there were no consequences to their behavior.  While Ms. Wilson's requests for help fell on deaf ears, male managers and male Sales Associates continued to harass and discriminate against women with impunity.

48.     In September 2009, immediately following Defendant VP Pollard's promotion of Ms. Keyhoe, Ms. Wilson complained again to Defendant VP Pollard about the rampant discrimination at the Princeville site.  Specifically, Ms. Wilson told Defendant VP Pollard that the discriminatory treatment of women could not continue, and that it was uncomfortable to work at Wyndham.  In response, Defendant VP Pollard stated that Ms. Wilson could either "party with the boys" or keep her mouth shut and continue to earn a large paycheck.

49.     Despite VP Pollard's previous threats to terminate any employees who contacted HR, Ms. Wilson immediately contacted HR Director Ward by phone and filed a formal complaint through Wyndham's corporate hotline, Wyntegrity, about the rampant sexual harassment and gender discrimination at the Princeville site.  Ms. Wilson further informed the Company that Wyndham's management at Princeville was manipulating hundreds of thousands of dollars through discriminatory promotions and sales opportunities.

50.     In September 2009, the day after Ms. Wilson made complaints to both Defendant VP Pollard and HR Director Ward, Defendant VP Jonah called Ms. Wilson into her office and informed her that she was being suspended.  Defendant VP Jonah stated that the directive had

come from Defendant VP Pollard and that Ms. Wilson was to go home and not return to the premises.  Ms. Wilson was put on suspension for four days, which negatively impacted her entirely commissions-based compensation.

51.     Finally, Defendant VP Jonah contacted Ms. Wilson and requested that she return to the Princeville site to meet with him.  During this meeting, Defendant VP Jonah informed her that one of the owners had complained about her.

52.     VP Jonah informed Ms. Wilson that Wyndham would investigate the complaint against her.  She remained on suspension until October 4, 2009, when VP Jonah again called her into his office and stated that Wyndham decided she needed to separate from the Company.

53.     Following her wrongful termination, Ms. Wilson contacted HR Director Ward and requested that HR Director Ward provide her with written documentation of the reason why she was terminated.  In response, HR Director Ward informed her that Wyndham did not provide any such written documentation.

54.     Wyndham's actions demonstrated to Ms. Wilson that they were terminating her because she had engaged in protected activities, including reaching out to its corporate office to report discriminatorily based manipulation of Company tours and dollars at its Hawaii resorts.

**B.     Joanna Wheeler**

55.     Ms. Wheeler brings individual claims to recover damages for gender discrimination and retaliation.

56.     In March 2009 Ms. Wheeler began her employment with Wyndham as a Sales Associate at Wyndham's Princeville, Hawai'i site.

57.     Prior to working for Wyndham, Ms. Wheeler worked in the sales industry for

nearly twenty years.

58.     Ms. Wheeler demonstrated promising performance when she joined the Company.  Ms. Wheeler received an award for achieving an exceptional monthly volume after working for the Company for a mere six months.

### i.     Discriminatory Compensation and Denial of Career-Enhancing Opportunities

59.     In the course of Ms. Wheeler's employment, Wyndham subjected her to discrimination in employment based on her sex and pregnancy by denying her pay and promotional opportunities equal to those of similarly-situated male employees, subjecting her to disparate terms and conditions of employment, a hostile work environment, retaliation, wrongful termination, and other forms of discrimination.

60.     As alleged herein, Wyndham cultivated an environment in which male managers enjoyed unbridled decision-making power and used this authority to bestow the most favorable sales opportunities upon male employees, thereby opening doors to pay and promotional opportunities routinely withheld from women.

61.     Ms. Wheeler observed this preferential treatment afforded to male employees throughout her employment at Wyndham.

62.     A portion of the Marketing Department Representatives' ("Marketing") compensation system depended on the volume of tours they were able to book for the Wyndham Sales Associates like Ms. Wheeler.   As a result, Marketing often booked tours for Sales Associates with guests who were "unqualified" for the tours, e.g. did not meet minimum income requirements.

63.     Company policy permitted Sales Associates to approach Marketing to have a tour removed from their records if, during the tour, the Sales Associate discovered that the guest was

somehow unqualified.  This had the effect of protecting a Sales Associates' numbers from being unfairly skewed by the types of guests assigned to them by Marketing.

64.   Soon after she began working at Wyndham, Ms. Wheeler noticed male Sales Associates were given preferential treatment when they requested that the Company remove a tour from their records.

65.   For example, on one occasion she observed male employee Rock White ("Mr. White") discussing potential tours with his manager.  Even though Wyndham policies prohibited managers from influencing the assignment of tours, Mr. White was permitted to review available tours and select those that he preferred.

66.   The preferential treatment given to male Sales Associates had a direct and obvious impact on their performance.  Specifically, due to the preferential and discriminatory treatment granted to Mr. White, his sales numbers quickly increased.

67.   Even though Mr. White was unable to make a sale each day, his numbers continued to grow.  As a result of this treatment, Mr. White's compensation and his opportunities for advancement at the Company increased.

68.   Although male management gave ample leeway to male employees, they did not similarly treat Ms. Wheeler.  For example, on one occasion, Marketing assigned Ms. Wheeler to a couple who clearly did not meet the income requirements.  This became clear to her as she interacted with the guests, one of whom was an unemployed full-time student.  However, when Ms. Wheeler approached Marketing to request that it mark the guests as "unqualified," Marketing flatly denied her request.  Although Ms. Wheeler brought up her frustrations to her managers, they never offered to step in on her behalf to support her.

69.     During the last months of Ms. Wheeler's employment, the Company often scheduled her tours so that she did not have time in between to prepare for her tours or even to use the restroom, rest, or eat.  The unmanageable schedule she was given made work extremely stressful and made it difficult for her to perform as well.  Male employees such as Mr. White, however, enjoyed manageable schedules that permitted them to rest and prepare for their next tours.  Ms. Wheeler reached out to Defendant Director of Sales Virag to inform him that she was struggling with her schedule and to propose a change to make her schedule more manageable.  However, Director Virag told her that she had to take the tours assigned to her.  This open and constant disparate treatment of females at the Company denied female employees equal sales opportunities, compensation, and career-advancement opportunities.

70.     Around December 2009, Ms. Wheeler also expressed concerns about the wrongful termination of Ms. Wilson.  On several occasions when the topic of Ms. Wilson's termination arose, Ms. Wheeler complained that she believed Ms. Wilson had been discriminated against.  Specifically, in January 2010, Ms. Wheeler told Defendant VP Jonah the employees at the Princeville site, including her, were shocked by Ms. Wilson's termination.  Defendant VP Jonah verbally disciplined Ms. Wheeler for speaking out about Ms. Wilson's termination, stating that her dissent was negative and unacceptable.

### ii.      Pregnancy Discrimination and Retaliation

71.     Ms. Wheeler became pregnant in December 2009.  In February 2010, she had a miscarriage.  Because of the loss, she went on leave.  Although she was devastated by the loss, she returned to work after a week because she was concerned that male-dominated management would think poorly of her for taking more time off.  Wyndham treated Ms. Wheeler differently

than it treated its male employees, who were given consideration for their personal family situations.

72.     After her return from maternity leave, in July 2010, management announced that it was raising the Volume Per Guest ("VPG"), to $2700.  Management stated that the Sales Associates were expected to achieve 10 percent above the minimum for a total VPG of $3100.  Prior to this change, the minimum VPG had been $2100 per guest.

73.     Due to the change, Ms. Wheeler fell slightly below the minimum VPG.  Nevertheless, her numbers hovered close to this new benchmark.  Soon after the announcement and before Ms. Wheeler had had an opportunity to raise her VPG, her manager Defendant VP Jonah informed her that she was being placed on a Specific Performance ("SP") plan for failing to meet this new minimum.  Had management objectively enforced the proclaimed "minimum," many of Ms. Wheeler's colleagues would have also been placed on SP.

74.     As part of the SP, Wyndham required Ms. Wheeler to make at least two sales per twelve guests ("CRS's") in order to keep her job.  Notably, the Company assigned multiple guests to each of her tours, which effectively reduced her sales opportunities from twelve to nine tours.  Upon information and belief, Wyndham did not similarly manipulate the number of CRS's per tour for similarly-situated males.

75.     Ms. Wheeler accomplished two large sales out of thirteen CRS's (i.e. nine tours), and each sale had a net value of $46,600.

76.     On August 2, 2010, two days after Ms. Wheeler completed her second sale and the sale was announced to the office, Defendant Director Virag pulled her aside and told her that he and Defendant VP Jonah wanted to meet with her in his office.

77.     When Ms. Wheeler arrived at his office, Defendants VP Jonah and Director Virag told her that she was being terminated for not meeting the terms of her SP.

78.     Ms. Wheeler was upset by this news, partly because she had noticed the preferential treatment given to her male colleague, Joseph Trosino ("Mr. Trosino"), who was also on SP with her at the time.  Specifically, the managers did not terminate him when he failed to complete his second sale in twelve tours.  In fact, even though the terms of the SP required Mr. Trosino to make two sales out of twelve CRS's, they gave him a thirteenth tour as a second chance to meet the criteria.  Mr. Trosino made a sale on his thirteenth tour.  From his two sales, Mr. Trosino sold a combined total volume of $17,000.  On the date of her termination, Ms. Wheeler's VPG was more than double Mr. Trosino's.

79.     Ms. Wheeler asked Defendant VP Jonah why the Company was terminating her on the one hand, and giving Mr. Trosino numerous exceptions on the other.  When she expressed her concerns, Defendant Jonah defended Mr. Trosino, saying, "Don't you know what he's been going through?"  It had been known around the office that Mr. Trosino's wife had left him early that year and that he had taken leave as a result.

80.     Moreover, Defendant Director of Sales Virag stated that one of the reasons that Ms. Wheeler had been selected for termination was that she had taken "too much time off that year," referring to the time she had taken off in February 2010 related to her pregnancy and miscarriage.  Ms. Wheeler was extremely upset by this comment and pointed out to him that she had been devastated by the loss of her baby.  Ms. Wheeler also pointed out to him that she had only been gone for a week, which was less time off than Mr. Trosino had taken that year.

81.     On the day that she was terminated, Ms. Wheeler ranked 7th out of 36 Sales Associates.  Mr. Trosino ranked 22nd.  Moreover, as of the day she was terminated, her VPG

was $3585 per guest, clearly above the supposed minimum.  Mr. Trosino's VPG was $1417.  In fact, there were less than ten total employees, including Ms. Wheeler, who had met the $3100 minimum, which meant that the other 20 Sales Associates in her office had failed to meet it.  However, Ms. Wheeler was the only one terminated that day.

82.    Soon after this conversation with Defendant VP Jonah and Defendant Director of Sales Virag, Ms. Wheeler called Wyndham's HR to complaint about her termination.  Ms. Wheeler informed the HR representative that she felt that she had been terminated wrongfully and that she had been held to a different standard of scrutiny than a similarly-situated male.  The HR representative was unaware that Ms. Wheeler had been terminated, but assured her that HR would investigate.  Ms. Wheeler never received a response to her complaint.

83.    Also around this time, Ms. Wheeler called Wyntegrity, Wyndham's corporate integrity hotline.  Ms. Wheeler filed a similar complaint expressing her concern about her wrongful termination.  The hotline representative told Ms. Wheeler that they would conduct an investigation.  However, she never received a response to her hotline complaint.

84.    Ms. Wheeler was officially terminated by Wyndham on or around August 15, 2010.

### DISCLAIMER OF FEDERAL REMOVAL JURISDICTION

85.    Pursuant to 28 U.S.C. 1332(d)(2), the sum or value of this action does not exceed $5,000,000, exclusive of interest and costs.

86.    Pursuant to 28 U.S.C. § 1332(d)(5), the number of members of all proposed Plaintiff class in the aggregate is less than 100.

87.     Pursuant to 28 U.S.C. 1332(d)(5), this action is not removable to federal court and if removed, Defendants have the burden of proving to a "legal certainty" the jurisdiction of any federal court over this action.

88.     Pursuant to 28 U.S.C. 1332(d)(11), even if the Court declines class certification because it concludes that some or all of the requirements of Haw. R. Civ. Pro. 23(a), (b)(2) or (b)(3) are not met, all of the claims in this action arise from events or occurrences and the injuries to Class Representatives and Class members occurred in Hawai'i.

    a.  The individual claims of the Class Representatives require resolution of the common question of whether Wyndham has engaged in a systemic pattern and/or practice of gender discrimination against female Sales Associates.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in her own life, career, and working conditions and in the lives, careers, and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.  The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on her individually and on females Sales Associates generally.  In order to gain such relief for themselves, as well as for the proposed class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief she seeks.

    b.  Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females who have been affected by these common questions of

law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed class, and Wyndham.

89.     The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

**FIRST CLAIM FOR RELIEF (INDIVIDUAL CLAIM)**
**VIOLATIONS OF HAW. REV. STAT. § 378-2**

**GENDER DISCRIMINATION**
**Pay, Promotion and Career-Enhancing Opportunities, Pregnancy, and Other Forms of Disparate Treatment**
**(On Behalf of Ms. Wilson and Ms. Wheeler Against the Corporate Defendants)**

90.     Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

91.     This Claim is brought on behalf of the Plaintiffs.

92.     Corporate Defendants have discriminated against the Plaintiffs in violation of Haw. Rev. Stat. § 378-2 by subjecting them to different treatment on the basis of their gender and/or pregnancy.  The Plaintiffs have been disparately impacted and disparately treated as a result of Corporate Defendants' wrongful conduct and its policies, practices and procedures and seek declaratory, injunctive, equitable and legal relief.

93.     Corporate Defendants have discriminated against the Plaintiffs by treating them differently from and less preferably than similarly-situated male employees and non-pregnant female employees without primary caregiving responsibilities, and by subjecting them to differential and substandard terms and conditions of employment including but not limited to

discriminatory denial of fair compensation, denial of fair sales opportunities, discriminatory denial of promotional opportunities, increased scrutiny, discriminatory discipline, and other forms of discriminatory treatment, in violation of the Haw. Rev. Stat. § 378-2.

94.     Corporate Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Plaintiffs, entitling the Plaintiffs to punitive damages.

95.     As a result of Corporate Defendants' conduct alleged in this complaint, the Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish for which they seek declaratory, injunctive, equitable and legal relief.

96.     By reason of Corporate Defendants' discrimination, the Plaintiffs are entitled to all legal and equitable remedies available for violations of Haw. Rev. Stat. § 378-5, including an award of punitive damages.

97.     Attorneys' fees should be awarded.


### SECOND CLAIM FOR RELIEF (INDIVIDUAL CLAIM)
### VIOLATIONS OF HAW. REV. STAT. § 378-2(3)

### AIDING AND ABETTING
### (On Behalf of Ms. Wilson and Ms. Wheeler Against the Individual Defendants)

98.     The Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

99.     On information and belief, Individual Defendants VP Jonah, VP Pollard, and Director of Sales Virag all actively and knowingly participated in practices that resulted in unfair

compensation and promotion, a hostile work environment, and other forms of discrimination based on gender.

100.    By aiding, abetting, inciting, compelling and/or ratifying Corporate Defendant Wyndham's discriminatory practices and decisions, each Individual Defendant has aided and abetted both the Corporate Defendants' and each of the other Individual Defendant's discrimination against the Plaintiffs, in violation of H.R.S. § 378-2(3).

101.    Individual Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Plaintiffs' rights.

102.    The Plaintiffs are therefore entitled to all legal and equitable remedies, as well as punitive damages.

103.    Attorneys' fees should be awarded.

**THIRD CLAIM FOR RELIEF (INDIVIDUAL CLAIM)**
**VIOLATIONS OF HAW. REV. STAT. §§ 378-62 to -65**

**RETALIATION**
**(On Behalf of Ms. Wilson Against the Corporate Defendants)**

119.    Ms. Wilson re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

120.    Ms. Wilson engaged in a protected activity by complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees, derogatory remarks, and sexual harassment—to people in management positions and in Human Resources.

121.    Defendants engaged in adverse employment actions against Ms. Wilson for engaging in protected activities.  Such adverse employment actions taken have been in the form of subjecting her to unfavorable terms and conditions of employment, including, without limitation, denials of sales opportunities leading to pay disparity, denial of opportunities for

professional advancement, increased scrutiny, and hostile working environments.  The adverse employment actions have materially and adversely affected Ms. Wilson's overall terms and conditions of employment.

122.    A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

123.    Defendants' retaliatory acts against Ms. Wilson were a direct, proximate, and pretextual result of Ms. Wilson's protected activities.

124.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Wilson, entitling her to punitive damages.

125.    As a result of Defendants' conduct alleged in this complaint, Ms. Wilson has suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

126.    By reason of Defendants' discrimination, Ms. Wilson is entitled to all legal and equitable remedies available for violations of the H.R.S. §§ 378-62 to -65, including an award of punitive damages.

127.    Attorneys' fees should be awarded.

### FOURTH CLAIM FOR RELIEF (INDIVIDUAL CLAIM)
### VIOLATIONS OF HAW. REV. STAT. §§ 378-62 to -65

### RETALIATION
### (On Behalf of Ms. Wheeler Against the Corporate Defendants)

128.    Ms. Wheeler re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

129.   Ms. Wheeler engaged in a protected activity of being pregnant and taking pregnancy-related leave.

130.   Ms. Wheeler also engaged in a protected activity of complaining about gender discrimination to people in management positions.

131.   Defendants engaged in adverse employment actions against Ms. Wheeler for engaging in protected activities.  Such adverse employment actions taken have been in the form of subjecting her to unfavorable terms and conditions of employment, including, without limitation, denials of sales opportunities leading to pay disparity, denial of opportunities for professional advancement, increased scrutiny, and hostile working environments.  The adverse employment actions have materially and adversely affected Ms. Wheeler's overall terms and conditions of employment.

132.   A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

133.   Defendants' retaliatory acts against Ms. Wheeler were a direct, proximate, and pretextual result of the Ms. Wheeler's protected activities.

134.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Wheeler, entitling her to punitive damages.

135.   As a result of Defendants' conduct alleged in this complaint, Ms. Wheeler has suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

136.     By reason of Defendants' discrimination, Ms. Wheeler is entitled to all legal and equitable remedies available for violations of the H.R.S. §§ 378-62 to -65, including an award of punitive damages.

137.     Attorneys' fees should be awarded.

### FIFTH CLAIM FOR RELIEF (INDIVIDUAL CLAIM)
### VIOLATIONS OF HAW. REV. STAT. § 378-2

### SEXUAL HARASSMENT
**(On Behalf of Ms. Wilson Against the Corporate Defendants and Defendant VP Pollard)**

138.     Ms. Wilson re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

139.     Wyndham has discriminated against Ms. Wilson by permitting an ongoing, severe or pervasive pattern and practice of sexual harassment against her by creating and maintaining a sexually hostile work environment in violation of H.R.S. § 378-2.

140.     Wyndham's sexual harassment detrimentally affected Ms. Wilson and altered her conditions of employment by creating a hostile working environment for her.

141.     Wyndham's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of her rights.

142.     As a direct and proximate result of Wyndham's aforementioned conduct, Ms. Wilson was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

143.     By reason of the continuous nature of Wyndham's discriminatory conduct, persistent throughout the employment of Ms. Wilson, she is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

144.     By reason of the sexual harassment suffered at Wyndham, Ms. Wilson is entitled to all legal and equitable remedies available under H.R.S. § 378-5.

145.    Attorneys' fees should be awarded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare and adjudge that the Corporate Defendants'  employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs;

B.    Order a permanent injunction against Wyndham Worldwide Corporation, Wyndham Vacation Resorts, Inc., Wyndham Vacation Ownership, Inc., and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

C.    Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and/or

D.    Order Defendants to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner; and/or

E.    Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described in D above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment

opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in E through F above; and/or

F.   Order Defendants to adjust the compensation and benefits for the Plaintiffs to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures; and/or

G.   Order Defendants to place or restore the Plaintiffs into those jobs they would now be occupying but for Defendants' discriminatory policies, practices and/or procedures; and/or

H.   Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and/or

I.   Award nominal, compensatory and punitive damages for each and every claim made herein; and/or

J.   Award for all damages allowed or recoverable by law, i.e. compensatory, special and general damages as allowed by law; and/or

K.   Pre-judgment interest; and/or

L.   Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiffs; and/or

M.   Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Plaintiffs to be determined at trial; and/or

29

N.      Order Defendants to make whole the Plaintiffs by providing them with appropriate lost earnings and benefits, and other affirmative relief; and/or

O.      Award punitive damages in an amount sufficient to punish and deter Defendants from engaging in any such conduct in the future and as an example to other employers; and/or

P.      Award any other appropriate equitable relief to the Plaintiffs; and/or

Q.      Award any additional and further relief as this Court may deem just and proper.

Dated: February 20, 2013

Carl M. Varady, Esq. (Hawai'i Bar No. 4873-0)
**LAW OFFICE OF CARL M. VARADY**
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawai'i 96813
Telephone: (808) 523-8447
Facsimile: (808) 523-8448
Email: carl@varadylaw.com

Felicia Medina, Esq. (Cal. Bar No. 255804)
**SANFORD HEISLER, LLP**
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 795-2020
Fax: (415) 795-2021
Email: fmedina@sanfordheisler.com

*Attorneys for Plaintiffs*

30